The 4th District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. Our first case of the afternoon is N. Ray, the Marriage of Geiser, if that is the correct pronunciation, and it is 420-0294. Would the counsel for appellate please state your name for the record? Good afternoon, Your Honor. My name is Drew Hickey. Thank you, and would counsel for the appellate please state your name for the record? Yes, good afternoon. This is Gina Wood. You may proceed. Thank you, Your Honor. May it please the court and counsel. My name is Drew Hickey, and I am counsel for appellant Colby Geiser. I'm going to start my argument today with the motion to continue because I believe the other issues, the child support issues and the property issues, stem from the trial court not allowing Mr. Geiser's motion to continue. As a little background here, Mr. Geiser's attorney, Mr. Bass, filed a motion to withdraw, and that motion was heard about 26 days before the trial. The motion was agreed by Mr. Bass and Mr. Geiser that Mr. Bass could withdraw, and Mr. Bass was allowed out of the case. Trial was set that day, 26 days later, and Mr. Geiser stated later in the proceedings that he believed he would have the opportunity to obtain counsel and that the trial would be continued, that three-day trial that was set. When it became apparent that he was not going to be able to- Whoa, back up. He thought it would be continued? Why would it be continued if he was able to acquire counsel? Because he thought the trial would be continued and he would have more time to obtain counsel, not that he would have to proceed pro se. He didn't think 26 days would be sufficient time for him to obtain counsel? He did. No, I'm sorry. He did believe that it was sufficient time, but my understanding after he tried to find counsel, he couldn't get anybody to take the case that close to trial. Ms. Hickey, I understand that you're starting with the motion to continue, but I wonder, is that where we really should start? I mean, the trial court in denying the motion to continue discussed how long this case had been going on, and I understand you indicate your client thought he was going to be able to get a continuance, but what was that based on and wasn't it incumbent upon him to clarify if that truly was going to be an opportunity he had to have more time? My understanding from the transcript is that he believed that from his attorney, and we don't have a record of that conversation, so I'm not sure about that, but he believed from his attorney that the three-day trial would be continued, and if he had that assurance, I don't think he would have taken that up when at the motion to withdraw hearing. But we have nothing to prove that at this point. Right. I don't believe there's anything in the record on that, except that when he filed his motion to continue, he did say that he, which it was filed a week before trial, he had tried to obtain counsel, couldn't obtain counsel, and so then he filed his motion to continue, and he did try to comply with the court's rules. He filed his pro se entry of appearance, but in the transcript from the May 28th hearing, he stated that he was uncomfortable proceeding with trial, and he was uncomfortable proceeding pro se. I think the argument would be completely different, and there may not be any argument on appeal here, if he would have said, I want to fire my attorney, and I want to proceed pro se, but he didn't. He stated all along that he was uncomfortable proceeding pro se, and that he thought he would be able to obtain counsel, and it was kind of one of these too little too late when he spoke to attorneys and wasn't able to obtain anybody, because there was so much evidence on both sides of the case, and likely schedules didn't permit. I mean, that part isn't in the record either, but I think that the assumptions that could be made, or the concessions for him, is once he realized he wasn't going to proceed with counsel, the trial court could have, there were several avenues available to the trial court. One was Dakota Civil Procedure Section, is it 2-1007, for good cause shown, and I think in this case, there was so much evidence that needed to be presented, and it needed to be presented competently for the trial court to be able to make a reasoned decision, that my client was just not able to present his evidence, because he didn't have the benefit of counsel. There also seems to be issues about your client's compliance with discovery. Is it possible that the trial court was of the opinion that your client really was just trying to obstruct the process, and had not been compliant, and should not benefit from that? Certainly. I think that's possible, but the evidence that I think counteracts that, is that my client had counsel conscientiously the entire time. I mean, as soon as he was served with the petition in 2015, he maintained an attorney that entire time, and he was diligent in having counsel. He even showed up to court a lot of times at status hearings and things that presence may not have been necessary, but he showed up and was present, so he was there participating in the proceedings, coming into court, and I believe that that shows that he was diligent, and that the delays, I think the record shows the delays were on both sides. There was a lot of evidence back and forth. There was a custody evaluator that takes time, so over the three and a half years, the delay was not only attributable to Mr. Geiser, and that's where I think the Reesey case comes in, where if there's no delays attributed only to one side or either party, that the motion to continue should be considered to be granted. I think it would be different if my client had changed counsel several different times, and not shown up to different hearings, and not shown up to motion hearings and things like that, but really the record showed that he was diligent in showing up for hearings and in keeping his counsel. There's more to diligence than showing up. There's diligence in doing what you're supposed to do. I mean, three and a half years after he entered an appearance and then was allowed to withdraw, we're still from your client's perspective at the beginning of the case. I mean, he has to do more than just appear in the courtroom. I'm sorry, that's a statement rather than a question. Justice Turner had a question. I like your statement, though. Here's my question. Counsel, doesn't the record show that your client knew as of April 11th that he would be without an attorney, and yet it's all the way up to, I think, August 26th, where the hearing on the financial questions is actually heard, and that's what's actually before the court today, the financial issues. So he had, if I'm reading the record right, between April 11th until August 26th to get an attorney, and he didn't do so. Isn't that a problem for you when you argue that the motion to continue should have been allowed and that there was an abuse of discretion of the trial court not doing so? I think that defeats your argument. Your response, please. Thank you, Your Honor. And respectfully, my response to that is the motion to withdraw was filed April 2nd, as you said. It was heard, I believe it was May 2nd, so a month later, to give time for notice, and then that was 26 days before the trial. So the actual withdrawal was heard 26 days before the family trial issues began, so the parental responsibility issues. Now, my client filed his motion a week before that trial was set to begin, and my argument here is that he is a pro se litigant. He's proceeding on his own. He brought the motion up at the hearing, which was, it was the Friday before, so the 24th. There was a pretrial hearing, and he had just filed his motion earlier that week, brings his motion to the court. It's denied that day according to the docket, and then denied on the 28th before the parenting time trial begins. So at this point, his motion has been denied several different times, and proceeding as a pro se litigant, he can't be expected to know that he needed to bring his motion up again or renew his motion before the financial trial. It had been denied and denied, and so at that point, the way I look at it is he just gave up, and I don't think that's unreasonable for a pro se litigant to have that response. But still, didn't he go four months without getting an attorney? He did. Before that August 26th hearing. Yes, between the three-day trial in May and then in August, he didn't try to get another attorney, and my response to that is simply he wouldn't know how to renew it. He didn't need to renew a motion to continue, he just needed to get an attorney. There's a difference between renewing the motion to continue and saying, okay, that's been denied, but was he at any point informed that he was prohibited from getting an attorney? No, not that I'm aware of. Okay. You may proceed. Thank you. Okay, so I believe in this case that the motion to continue should have been granted, and the other part here is just that counsel stated in her brief that we're arguing for a more lenient standard. I'm not necessarily arguing for a more lenient standard here for him to be held to, just that he be afforded the opportunity to obtain counsel. So I'm going to move on here to the child support arguments. The figures that were used were back to 2013. Petitioner's Exhibit 33 in the case really is a good summary of what the child support figures that were used, or the income figures that were used to calculate the child support. I believe the court improperly used the 2013 tax return and the 2013 income for several different reasons. Number one, I believe it was too remote in time to have used those figures. If the income had been steady, or if this $316,000 income in 2013 had not been such an anomaly, it may have been proper to go back that far. But I believe both the Friesen case and the Schroeder case supports the argument that the anomaly, it was an anomalous figure even for this family at this income. The reasons it was an anomaly, number one, is about $30,000 of that income was attributed to the spouse. So Mrs. Geiser made that from her employment with carpet weavers. That was completely separate than my client's ability to pay. The second part is 30 to 35% in the testimony, my client testified, and it was not disputed that 30 to 35% of his income in 2013 was attributable to Mrs. Geiser's father. So Mrs. Geiser's father was a builder, my client was a painter, and so it was a great way for the father to support the daughter and their new marriage. Now when the marriage broke up in 2014, you immediately see this drop to $188,000 of income. That's immediate even the next year. And that's because that 30 to 35% of the income was dried up by not having the patronage from the father. So those figures right away, I think it was improper to impute that $316,000. Not only that, but it'd be one thing if my client then the next year or a few years later was able to recover that, but the evidence showed he was never able to recover that. He declared bankruptcy in 2016, and so the court is using numbers from before he declared bankruptcy to impute this income. And even if you take the 2017 to 2019 totals of $108,000, and this is by plaintiff's numbers, this isn't even what my client testified to, but just using plaintiff's numbers, if you take that, the child support is about $853 a month. That's still more than the ability of my client to pay because my client testified that he made about $35,000 to $52,000 a year depending on volume. And so that's still more than he has the ability to pay. Counsel, how did plaintiffs calculate that three-year average of income at $108,280.89? Do you know? I believe it was based on the tax returns. Okay. And then you then used that $108,000 based upon plaintiff's calculations and determined that child support would have been about $853. Is that right? That's correct. Yes, Your Honor. Okay. Is there any dispute that child support based upon the $108,280 would come out to $153.37 a month? I don't believe so because my client didn't present that at trial. That was a number that I came up with with regard to the briefs. It might have been hard for him to come up with that number since he didn't produce a 2018 tax return or a financial affidavit. I mean, here he is complaining about them looking back at prior year's income and he doesn't file a financial affidavit for his present circumstances and he doesn't provide a tax return for 2018 which would be a more timely measurement perhaps of his income. What else is the court supposed to do but look back at how successful he was? And apparently the trial court did take into account that he lost his father-in-law's business but he also, the court specifically found that he was trying to hide income and he wasn't being forthright in explaining his financial circumstances. Now in the face of that finding, how can it be error for the trial court to use what is available? Again, I would just say this $316,000 even under plaintiff's numbers was too remote in time and it was an anomaly. If he had made that and it showed even five years or four years, if it had showed that he had made that closer in time to the trial, then it would have been it would have been more likely that he could afford that now. But going back to this and also imputing income or also taking into account as part of that $316,000 income from the spouse, you'd have to take that out before you could even do the calculation. And so I believe taking the $316,000, the 2013 tax return on its face caused a problem there for his ability to pay now. And also his testimony to his ability to pay and that's that's the argument for the arrearage is that then adding $250 on top of that when his testimony and his business manager's testimony showed that he was not able to pay and cover that. I want to interrupt you again. You acknowledge that the trial court found your client to be not credible, correct? I do. All right. But here's my question. The $108,280 average has nothing to do with your client's credibility because that was plaintiff's calculation. Am I right about that? Yes. Okay. I got another question. I'm going to digress a little bit. In your reply brief, you're talking about this Somerset property and you seem to indicate that there was evidence in the record that that property was non-marital. In fact, you don't seem to indicate it. You say it. What was the evidence before the trial court that that was non-marital property? The evidence that was presented was a deed to the property. Actually, I think, I'm sorry, it was a settlement statement. The settlement statement was only in my client's name. I don't believe there was any testimony that the parties lived there, that it was marital property and that it was purchased before the properties were married. That's my understanding. And so it was never shown. The settlement sheet shows that it was purchased before the marriage, am I understanding you correctly? No, I'm sorry. I don't believe there was any evidence that stated that he had purchased it during the marriage. No, I'm asking, is there evidence that it was purchased prior to the marriage? That's what I'm asking you. No, not in the settlement statement. The only evidence I saw regarding that was his name was on the settlement statement and there was no evidence that it was marital property. But your client did not take the position, I don't think your client even addressed the issue of whether or not that was marital or non-marital, is that correct? That's correct. And that's back to the argument that he wouldn't know to do that, to make that classification, because it was too complex for him to make that classification. Well, it wouldn't be too complex for him to say, hey, my wife was employed in 2013 or 2014, whenever it was. So part of that that you're using to average is her income too. I mean, that isn't a very complex factor. That it was her income? You made the point that it was misleading to attribute her income to him because that was the figure being used for that year, for what the early year that she earned 30 or $35,000. He never mentioned that. And yet, that's pretty basic. Well, I think if I remember correctly, the way that came out in her testimony was the 30 to 35,000. And it was also on the tax return itself that that income was attributed. That might have been factually correct. I'm saying he never brought it up. No, I don't think he did. Your time has expired, counsel, and you'll have some time on rebuttal. And I might also say you're being asked tough questions and you are responsible for the record. And we know that you did not represent your client at trial. Thank you. Thank you. Thank you. Thank you, your honors. May I please the court and counsel. Mr. Geiser's counsel has made arguments regarding his dissatisfaction with the trial court's order pertaining to certain issues. But what we haven't heard anything about is the standard of review that's applicable to these issues. Appeals, as we know, are not meant for litigants to simply have, for lack of a better term, another bite at the apple. Standards of review are strict and demand appellants to meet a high burden before reviewing courts. After all, we want closure for litigants, closure emotionally, physically, and financially. This case commenced in August of 2015. Now five and a half years later, remains in the balance. This is despite the fact that over the course of these many years, both parties have had more than ample time and ability to have their issues resolved within the proper forum, the trial court. Their issues were full and fairly litigated and adjudicated. Neither party was granted the entirety of their relief sought. However, neither party can argue that no reasonable person could take the views adopted by the trial court. The standard of review before this court today. The appellant first argues he should have a chance to revisit certain issues because the trial court denied a motion to continue. He filed prior to a hearing which dealt with matters which are not at issue in any way before this court. He agreed to have his attorney withdraw prior to the hearing regarding a parenting plan, despite the fact this attorney had represented him for the three and a half years leading up to the May 2019 trial. He signed the acknowledgement consenting to the withdrawal but failed to appear for the hearing regarding such. He was given in excess of the statutory 21 days to secure new counsel and chose not to do so until a motion to reconsider was filed. The trial that took place in reference to the issues before this court took place 116 days after the time his prior counsel had withdrawn. And he did in fact retain counsel who had previously been involved in this case representing Mr. Geiser's fiancee as early as August of 2018. And so there was a relationship with an attorney that spanned several years. But most importantly, he never filed a motion to continue the August 2019 hearing, nor did he raise an issue with that within his motion to reconsider. So it's our position that issue should be considered waived and never brought before this court's attention. Certainly the trial court has no duty to represent to Mr. Geiser ongoing obligations to present motions, nor is it the trial court's obligation to tell him he should or should not hire counsel. Regarding the child support order and finding, the record is more than child support obligations or calculations, excuse me. He never provided a proposal to the trial court and yet expects this court to find that the trial judge abused her discretion. The record is also clear that Mr. Geiser went to great lengths to conceal, camouflage, and otherwise hide income. He's had numerous business enterprises. He's deposited significant funds into the business accounts since he chose not to use personal bank accounts. Interestingly, and this evidence was shortly after the business account records were subpoenaed by my client, he signed off from ownership of those accounts and alleged his business, the same business that was in the same nature as all of his prior businesses, was owned solely by his 21-year-old fiance and that he was strictly her employee. This is even contrary to his website advertising, which we presented to the court as evidence for his latest company, Clean Cut Painting and have proudly grown the company. Colby even placed a prior business entity that was named after him, Colby Co LLC, into his fiance's name during the pendency of the divorce, yet continued to advertise himself online as an owner. When Colby Co was sued in Macon County in 2018, it was Colby, not Derrick, named as a defendant and it was Colby, not Derrick, from whom the plaintiff obtained a earnings far exceeded the small salary he claimed within his latest tax returns. All in all, the court properly find that he could not be considered credible and that he was trying to hide income and minimize his support obligations. On the other side, the record's clear that Mrs. Geiser went to considerable efforts and costs to acquire and present to the court meaningful and credible evidence regarding income and child support calculations. She filed and had heard multiple motions to compel discovery compliance. This was while Mr. Geiser had counsel. She issued a substantial number of subpoenas. She reached numerous entities, online records, and websites. She provided more than one theory as to how income could be calculated in this case. And so, even if for the sake of argument, Petitioner's Exhibit 33 is not considered appropriate because it goes back in time seven years. And I would suggest that our case law allows the court discretion in that. In fact, in the DeFatta case, the court went back 10 years and was found to have acted properly. We also presented to the court and counsel Petitioner's Exhibit number 22, because the point was that 2017 to 2019 income was not reliable based upon what Mr. Geiser had put before the court in its limited form. As Justice Knacht pointed out, Mr. Geiser failed to provide any type of 2016 or 2018 tax returns. We, on the other hand, did a complete forensic analysis of his bank accounts as represented within Petitioner's Exhibit 8 and determined that over course of 2017 to 2019, his average yearly income was $216,561, which is higher than when we, within Petitioner's Exhibit 33, as an alternate proposal, showed if you accept the lower income that Mr. Geiser suggests is appropriate for 2017 through 2019 and average it with the income information we had that was at the commencement of this case and we believe more accurate because Mr. Geiser wasn't yet minimizing income, that number's lower. So we think the court was generous to Mr. Geiser when it accepted Petitioner's Exhibit 33 versus Petitioner's Exhibit 22. Counsel, you lost me there. The brief of your opponent says that you did a calculation of defendant's income between 2017 and 2019 and that by your own calculations, the average salary was $108,280. Is that wrong? It's partially correct and partially wrong. I believe what counsel was referring to is Petitioner's Exhibit 33, which was a demonstrative exhibit, outlining income from 2013 through 2019, and the 2017 through 2019 average was based upon Petitioner's Exhibits 23 through 32. We did not do a child support calculation based upon those years. Our child support calculation was based upon the totality of 2013 through 2019. There's been no calculation based upon $108,280 by either party in this case. What we did provide for those years, which we thought was a more accurate depiction of Mr. Geiser's income, is Petitioner's Exhibit 22 because as I know this court has dealt with in the past, often when self-employed individuals we believe are concealing, hiding, and lying about income, we have to do a deeper dig and we did that with bank records and backed out extensive number of expenses without any evidence for Mr. Geiser suggesting he had expenses. We went ahead and tried to take a very conservative approach in his favor to come up with reasonable and credible figures of income and lo and behold when you do that kind of analysis, his annual income is right on par with what he was disclosing within tax returns and financial statements previously. And I note too we did not even include the 2013 income he disclosed within the affidavit we provided to the court signed by him as Petitioner's 14, where in 2014 he stated he was earning half a million dollars in personal income. We didn't use that number. We could have. I think the court could have relied upon that because again we believe that the information that was available at the commencement of this action is representative of what he was earning, that he took great efforts and they were obvious efforts, so obvious the court made a finding that she didn't believe him to make it out that a man who was claiming he made half a million dollars, whose bank account showed millions of dollars of deposits, hundreds of thousands of dollars of personal expenditures, who switched LLC names, changed LLC names, refuses to use a personal account, refuses to give us a financial affidavit, refuses to file certain tax returns, we can analyze based upon what his spending habits were for those his deposits and spending habits were for those years were missing any other income and it's right on par with the prior income. It's lower actually than what he was claiming to a lender. So I think the record would be it's fair to say that the trial court's ruling, particularly given its very broad discretion to consider income, sources of income, credibility of income and calculates child support, is in conformance with our statute in long-standing case law and is not an abuse of discretion that Mr. Geiser certainly cannot argue that no reasonable person would not adopt these findings. Let me ask you this, why would the trial court use pre-bankruptcy income in its calculation? I'm having a hard time following the logic in that, especially since it was $307,000 and then the following year, this is 13 and then 14, it was $188,000. Then in 16, there was a bankruptcy. It just seems very odd to me that the trial court would go back to those pre-bankruptcy salaries. Your Honor, she didn't make a finding specific to that. What I would suggest is that she did average the lower income of 2017 through 2019 for three of the years of that Petitioner's Exhibit 33 calculation. I believe she included the prior income because she also believed that Mr. Geiser's income wasn't being credibly related by him based upon Petitioner's 22. And there was no evidence that the bankruptcy itself had any impact upon his income. In fact, his bank records, and we provided years of bank records, pre and post-bankruptcy would suggest his deposits were still substantial from these businesses and that his spending was substantial. He was living a very luxurious personal lifestyle. And so it's his duty to show, Your Honor, this is the problem with my ability to earn income. These are the things that have negatively impacted that ability. My bankruptcies further impacted that. He didn't do any of that. He was silent. Did his counsel withdraw because of an allegation that he wasn't being paid? Counsel was not being paid? No. And is there any evidence? We have no record. I don't believe so. Well, if I may take a moment, I'll peek at my appendix. I think I included the motion to withdraw. I know that I included his acknowledgement. There was no suggestion that it was based upon failure to pay that I recall. I may be wrong. I'm working off of memory. I believe the motion alleged that Colby was unable to fulfill a financial obligation to counsel. Oh, okay. It does say that. Okay. Well, maybe Mr. Geiser was not fulfilling. Let me ask you this in relation to the bankruptcy and consideration of earnings prior to the bankruptcy. Is it fair to say that the court was of the opinion that there was a concerted effort on Ms. Hickey's client's part to basically once he knew that he was getting divorced to try to suggest and to try to demonstrate that he no longer was making the kind of money that he had been making? Absolutely. And she made findings to that effect. And this is what's so paramount about the abuse of discretion standard, because the one thing we can never have before your honors is your ability, unless we start videotaping trials, is your ability to see the tone and tenor, hear the tone and tenor of the parties in the witness's testimony, to see their facial expressions, to watch their demeanors. Our trial judge had all of those opportunities over the course of several hearings in several years. And when you combine that with the evidence that was presented, which it would take days for us to go through all of that, she didn't believe him. She discreetly basically said he was a liar. And I do believe she found our evidence to be credible because we weren't just coming before the court and throwing our hands in the air and saying, well, we don't know what he earns, but we think he earns this. And let's use the half a million dollars he put on his financial statement. We spent considerable amounts of time and money to put together reasonable theories as to support. And if you look at Petitioners 22 and all of the supporting documents, that would not indicate if bankruptcy had any impact upon his ability to earn or spend income. So if he chose not to pay his lawyer, those records, if you look at those bankers, would show that he should have, because he had the ability to pay his attorney. Well, I did not practice in bankruptcy law years ago, but isn't there a that the bankruptcy judge, the federal judge has to accept? Isn't there one? Do you know what it is? Your Honor, I do not know. I apologize. I don't practice in that area at all. But I do know that Mr. Geiser could have objected to his counsel's withdrawal. I don't know if the trial court would have denied the motion and said, look, I don't have the funds right now. I've gone through a bankruptcy. Now, mind you, I cannot remember off the top of my head, the bankruptcy timing, but that happened well prior to our final hearings in this. I think it was in 2016, the bankruptcy. I apologize. I don't know. But I know it was well prior. It put our case on hold for a very long time and it was done. As I recall, although I'm really stretching here, I think one of the definitions of bankruptcy is liabilities exceed assets. Does that sound right to you? Your Honor, I couldn't speak to that. I don't know. I should be more well-versed. Wouldn't a bankruptcy judge have to find that he qualified for bankruptcy before he ultimately issued an order declaring bankruptcy? He may, but I don't know. I wasn't a party that are privy to those proceedings. What Mr. Geiser presented to the bankruptcy court and who was holding him to a measure of credibility. I don't know if hard questions were asked, if a trustee did the kind of searches we did. We weren't part of that process. We didn't want to interfere with that process or try and make it difficult. But what I do know is he relieved himself of all of his debts, which makes him more capable of meeting child support obligations. What I do know is the kind of income he was earning and the kind of income he was spending prior to, during and after his bankruptcy. If the bankruptcy court weren't made privy to that, that's unfortunate. Let me ask a question. I believe that your argument is actually that your forensics examination of his income stream and his outgo, the things he was spending money on, several years after the bankruptcy were so high, or so you made reference to a luxurious lifestyle, that the amount of income that could have been attributable to him, if the judge had chosen to do so, was such that the child support ordered would have been significantly higher than the amount that she actually ordered. Yes. Yes. That was the exhibit where there would have been higher gross income and higher child support if the court would have accepted that. Ms. Wood, on a different note, Justice Turner had asked opposing counsel about the Somerset property. And I believe that we know that this issue really wasn't raised before the trial court, but if it is accurate that that property was non-marital, wouldn't the proceeds from the sale of that property also be non-marital? Yes, if they weren't commingled into the marital estate. And if in fact, there is showing that there were non-marital real estates that real estate parcels sold to acquire that. Again, what we knew, and there is no burden on us to trace for Mr. Geiser, and there's no burden for us to try and figure out what may or may not be his non-marital. There's a presumption of marital property. It's his burden to overcome. We weren't talking about real estate holdings. We were talking about sale proceeds from real estate, real estate parcels, cash. And that cash was incumbent upon Mr. Geiser to trace and show that it should be considered a part of a non-marital asset that simply changed in its form. And he didn't do that. And I know that my client... That's why you were arguing in your brief when you say that you're dealing with cash and it was sold during the marriage. That's what you're getting at. You're not saying that somehow the money from the sale is automatically marital property. You're just saying, look, we didn't know anything. He didn't present anything about the original position of the property, but we know it was sold during the marriage, and we were looking at the cash. Exactly. We didn't have any... Exactly. And one quick note, I know my time is up. My client was suggesting that this marital estate, and had good evidence to support this, was worth anywhere between three to three and a half million dollars before Mr. Geiser started liquidating assets without her permission and then ultimately went into bankruptcy court. Now, the trial court chose to use a fraction of that, about a tenth of it, for division between the parties in this case. And the logic was perhaps those other assets had to be surrendered as part of the bankruptcy. May or may not be accurate, not for me to judge. Also, not an abuse of discretion for her either way. That's the problem. This is, again, an abuse of discretion standard. Could no reasonable person adopt her position that, look, I don't have to characterize the property or provide the evidence to characterize property. This is the evidence. There's a presumption. Mr. Geiser hasn't proven otherwise, so I'm going to divide a tenth of this, and really my client receives a fifth of it through the equalization payment. How that can be considered an abuse of discretion or even a manifest weight of the Yes, thank you. Yes. Thank you, Your Honor. Very briefly, there was a question about Petitioner's Exhibit 33, and the reason that I kind of used that in the calculations going on with the brief is because the court relied on that, as I believe Ms. Wood said, in making her determination for from this Exhibit 33 to take this as, you know, as a credible exhibit and take this as the evidence that the court used in making her determination. And so, again, this is Petitioner's information. So, without, you know, regardless of the credibility or what the court found or the credibility of Mr. Geiser, if you just take this Petitioner's Exhibit 33, which is what the say that based on what's on the basis of this exhibit, the $316,000 was too remote in time, and it was an anomaly on their tax return. And there were other things that went into that for the child support. And let's see. As far as the Somerset property, the last thing I'll say with that being non-marital is if the property is non-marital and those funds were held out as non-marital funds, then the court's correct that those would be traceable as a non-marital asset. There was no evidence presented that that property was, or that cash, after it was sold during the marriage. There's no dispute it was sold during the marriage because it was ever commingled and there was no evidence from either party that put forth that it was a marital property. And Mr. Geiser didn't have the ability really to say, or didn't know to say, this is a non-marital property and here's the tracing of those funds. So, I believe that is the end of my rebuttal and thank you to the court. Thank you. This matter under advisement and await the readiness of the next case.